Receipt number AUSFCC-10144535

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

```
*******************************************
                                          *
CLEARONE ADVANTAGE, LLC,                  *
                                          *
        Plaintiff,                        *     Case No. 25-101 T
                                          *
v.                                        *
                                          *
THE UNITED STATES,                        *
                                          *
        Defendant.                        *
                                          *
*******************************************
```

**COMPLAINT**

Plaintiff ClearOne Advantage, LLC ("Plaintiff"), by counsel, for its complaint against the United States of America, states as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action to recover refunds of overpaid federal employment taxes for the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, plus interest thereon as provided by law.

2. Plaintiff is entitled to these refunds under Section 2301 of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act (Pub. L. 116-136, 134 Stat. 281), as modified and amended by the Taxpayer Certainty and Disaster Relief Act of 2020, enacted as Division EE of the Consolidated Appropriations Act, 2021 (Pub. L. 116-260, 134 Stat. 1182, December 27, 2020), and the American Rescue Plan Act of 2021 (Pub. L. 117-2, 135 Stat. 177, March 11, 2021).

3. The CARES Act was signed into law on March 27, 2020, to provide direct economic assistance for American workers, families, small businesses, and industries in the face of the COVID-19 pandemic in the form of a refundable payroll tax credit called the "Employee Retention Credit," or "ERC." Congress modified and extended the ERC in December 2020 with

passage of the Taxpayer Certainty and Disaster Relief Act of 2020 and again extended the ERC in March 2021 with passage of the American Rescue Plan Act of 2021.

4. The IRS has unreasonably delayed processing ERC refund claims, including Plaintiff's ERC refund claims.

## PARTIES

5. Plaintiff is a limited liability company formed under the laws of the State of Delaware. Plaintiff's principal place of business is in Baltimore, Maryland.

6. Defendant is the United States of America.

## JURISDICTION AND VENUE

7. This action arises under 26 U.S.C. § 7422(a), which allows a plaintiff to bring an action to recover any Internal Revenue tax alleged to have been erroneously or illegally assessed or collected.

8. This action is proper under 26 U.S.C. § 6532(a)(1), which allows a plaintiff to bring a tax refund action in this Court once six months have passed from the filing of the claim for refund with the IRS and before two years from the date shown on the IRS's notice disallowing the claim for refund.

9. Jurisdiction is proper under 28 U.S.C. §§ 1340, 1346(a)(1), and 1491(a)(1), which provide that the Court of Federal Claims shall have original jurisdiction over any civil action arising under any act of Congress providing for Internal Revenue and for the recovery of any Internal Revenue tax alleged to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the Internal Revenue laws.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1402(a)(2).

**STATEMENT OF FACTS**

11.    Plaintiff is in the trade or business of providing debt settlement, debt negotiation, and related debt relief services to consumers. Plaintiff enters into a debt settlement contract with individual consumers and negotiates on behalf of those overextended consumers to settle the consumers' outstanding debt with their creditors. Consumers typically enrolled in a 36-to-48-month debt resolution program.

12.    Pursuant to Federal Trade Commission ("FTC") rules, Plaintiff may only charge and collect fees from the consumer after a debt resolution settlement is approved by the consumer's creditors and the consumer, and payments by the consumer under the settlement agreement have been made. *See* 16 C.F.R. § 310.4(a)(5). Plaintiff's estimate of fees Plaintiff will earn from consumers with enrolled debt is commonly referred to as a "net fee backlog." The success of Plaintiff's business depends primarily on Plaintiff's ability to enroll debt from new consumer clients and grow Plaintiff's net fee backlog. Typically, Plaintiff works with a consumer client for approximately 49 months from enrollment before Plaintiff's fees are fully collected. Plaintiff does not recognize revenue from debt settlement services until all criteria have been met under FTC rules to charge and collect fees from consumers.

13.    Prior to the COVID-19 pandemic, Plaintiff operated its business primarily through a call center in leased office space located in Baltimore, Maryland, and a satellite office in Chandler, Arizona that was opened in 2018. In November 2019, Plaintiff executed a lease amendment to add more than 7,000 rentable square feet to its Baltimore office, expanding the total leased space of Plaintiff's Baltimore facility to more than 33,000 rentable square feet. Plaintiff also leased approximately 5,900 rentable square feet for its Chandler, Arizona office. Substantially all of this leased space was used for Plaintiff's call center operations.

14. In late 2019 and early 2020, COVID-19 emerged as a novel respiratory disease that spread throughout the world, resulting in a global pandemic. Governmental authorities issued orders to address the pandemic that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19. The governmental response to the COVID-19 pandemic involved historically unprecedented measures, including lockdown orders, social distancing mandates, and forced business closures.

15. On March 23, 2020, Maryland Governor Larry Hogan issued an executive order mandating the closure of all non-essential businesses. *See* Md. Exec. Order No. 20-03-23-01 (Mar. 23, 2020). Governor Hogan issued a stay-at-home order on March 30, 2020. *See* Md. Exec. Order No. 20-03-30-01 (Mar. 30, 2020). Arizona Governor Douglas Ducey issued a similar shelter-in-place order the same day. *See* Exec. Order No. 2020-18, Stay Home, Stay Healthy, Stay Connected Physical Distancing to Mitigate COVID-19 Transmission (Mar. 30, 2020).

16. Maryland maintained a statewide stay-at-home order until May 13, 2020. *See* Md. Exec. Order No. 20-05-13-01 (May 13, 2020). Baltimore City did not lift its local stay-at-home order until June 8, 2020. *See* Exec. Order of Bernard C. "Jack" Young, Mayor of Baltimore City (June 8, 2020). Maryland did not permit non-essential businesses, other than those principally selling goods, to reopen until June 3, 2020. *See* Md. Exec. Order No. 20-06-03-01 (June 3, 2020). Baltimore City extended the non-essential business closure order until June 19, 2020, at which time non-essential businesses were permitted to reopen at a maximum capacity of 50 percent. *See* Exec. Order of Bernard C. "Jack" Young, Mayor of Baltimore City (June 19, 2020).

17.    Baltimore City reduced the capacity limit for non-essential businesses from 50 percent to 25 percent effective August 7, 2020. *See* Exec. Order of Bernard C. "Jack" Young, Mayor of Baltimore City (Aug. 7, 2020). The 25 percent capacity limit remained in effect in Baltimore City until March 26, 2021, when Mayor Brandon Scott issued an executive order increasing the maximum capacity to 50 percent. *See* Exec. Orders of Brandon Scott, Mayor of Baltimore City (Dec. 9, 2020, Jan. 21, 2021, Feb. 17, 2021, Mar. 3, 2021, Mar. 11, 2021, Mar. 22, 2021). Mayor Scott rescinded capacity restrictions on businesses in the City of Baltimore on May 15, 2021. *See* Exec. Order of Brandon Scott, Mayor of Baltimore City (May 14, 2021).

18.    Governor Hogan instituted a statewide mask mandate on April 15, 2020. *See* Md. Exec. Order No. 20-04-15-01 (April 15, 2020). The statewide mask mandate was continuously extended and remained in effect until July 1, 2021. *See* Md. Exec. Order No. 21-06-15-01 (June 15, 2021). Shortly after the statewide mask mandate expired, Mayor Brandon Scott announced a citywide mask mandate on August 5, 2021. *See* Mayor Scott Reinstates Indoor Mask Requirement in Baltimore City, MAYOR'S OFF. BALT. CITY (Aug. 5, 2021), https://mayor.baltimorecity.gov/news/press-releases/2021-08-05-mayor-scott-reinstates-indoor-mask-requirement-baltimore-city. The Baltimore City Health Commissioner issued a directive reinstating the citywide mask mandate on August 10, 2021. *See* Letitia Dzirasa, M.D., Health Comm'r, Health Comm'r Updated Directive & Order for Face Coverings (Aug. 10, 2021).

19.    The Arizona Department of Health Services ("ADHS") issued regulations for businesses under the authority granted by Governor Ducey. *See* Ariz. Exec. Order 2020-40 (June 17, 2020); *see also* Arizona Department of Health Services, Requirements for Businesses Pursuant to Executive Order 2020-40 Containing the Spread of COVID-19 (2020). The ADHS regulations required businesses to allow employees to telework, and mandated social distancing

of at least six feet in between tables, desks, and chairs in an open space. These regulations were mandatory until at least March 25, 2021. *See* Ariz. Exec. Order 2021-06 (Mar. 25, 2021).

20.     In response to the business closure and stay-at-home orders, Plaintiff closed its call center facilities in Baltimore, Maryland and Phoenix, Arizona. Plaintiff was forced to transition all its employees to remote work. Prior to the COVID-19 pandemic, approximately half of Plaintiff's employees worked remotely. Telework was limited to high-performing sales staff who were required to return to the office if productivity dropped. Plaintiff utilized substantially all its office space for call center operations.

21.     After the stay-at-home orders were lifted in Maryland, Baltimore City imposed capacity limits, sanitization procedures, and COVID-19 monitoring and reporting requirements for businesses that remained in effect until May 15, 2021. Arizona required businesses to adopt social distancing measures that effectively reduced office capacity, in addition to sanitization procedures. The capacity limits and social distancing requirements meant that only a small portion of Plaintiff's employees could have returned to the office. However, it was not feasible for Plaintiff to return a small portion of its employees to in-person work while other employees teleworked. The nature of Plaintiff's call center operations required on-site managers to provide supervision, monitoring, and support for in-office personnel. Implementing this staffing for a small in-office group while most other employees teleworked would have been cost prohibitive and logistically complicated. Thus, the capacity limits meant that all of Plaintiff's employees had to remain remote.

22.     The face covering mandates in effect in Baltimore City required employees working in office spaces to wear face coverings. The mandates did not provide an exemption for employees speaking with customers on the phone. Plaintiff's call center employees spend most of their time on the phone speaking with clients and potential clients or communicating with their

managers. Wearing face coverings would have hindered phone communications with clients and potential clients. In addition, on-site managers must sit and monitor call center employees and provide quiet instruction while these employees are speaking with clients and potential clients. It was not feasible for managers to provide "desk coaching" while wearing a mask. This inability to provide desk coaching contributed to the decline in employee productivity. Maryland and Baltimore City retained mask mandates through July 1, 2021, after the capacity restrictions were lifted. Baltimore City announced a new mask mandate on August 5, 2021, amidst the surge of the Delta variant of COVID-19. Plaintiff was not able to plan and implement a return to the office while COVID-19 restrictions were rapidly changing.

23. Plaintiff's employees were significantly less productive while working remotely in 2021 compared to 2019 when only high-performing sales employees worked remotely. The number of "closes per rep per day" or consumers enrolled in the Plaintiff's debt settlement program per sales employee per day declined by 37 percent, 29 percent, and 6 percent in the first three calendar quarters of 2021, respectively, compared to the same quarters in 2019. Plaintiff's total dollar amount of enrolled debt declined by 29 percent, 41 percent, and 40 percent, respectively, in the same timeframes, and enrolled debt per "production hour" (i.e., number of hours worked by sales employees) declined by approximately 38 percent, 30 percent, and 15 percent, respectively, in the same timeframes.

24. Newly hired employees, who received virtual training instead of in-office training, had even greater productivity declines in closes per rep per day and debt enrolled per production hour compared to Plaintiff's existing sales employees. Plaintiff hired new employees in the first and third calendar quarters of 2021, due to higher-than-normal turnover. Closes per rep per day for new hires decreased by an average of 32.5 percent in the first and third quarters of 2021

-7-

compared to the same quarters in 2019, and debt enrolled per production hour declined by an average of 42.91 percent in the first and third quarters of 2021 compared to the same quarters in 2019. The lack of immediate, in-person supervision delayed new employees' skill acquisition and hindered effective onboarding of new employees.

25.    Plaintiff's senior management, including the Chief Executive Officer residing in Delaware, the President in Colorado, and marketing personnel in Los Angeles, California, could not visit the office to meet with staff while Plaintiff's offices were closed. In-person meetings between management and employees were not possible.

26.    Ensuring compliance with the numerous state and federal rules, regulations, and laws, governing the handling of sensitive personal information, such as bank account numbers and credit reports, required the Plaintiff to make substantial additional investments in employee time and information technology resources. to accommodate a fully remote work force. This requirement significantly increased the workload of Plaintiff's information technology (IT), security, and operations teams compared to their in-office workload in 2019.

27.    The transition to full remote work also compelled Plaintiff to expand its IT help desk staffing and extend their work hours, as technological issues became more frequent and resolution times lengthened in the remote environment. Supervisors had to manage, train, and educate remote teams through virtual tools, which increased the time spent on oversight and employee performance tracking compared to in-office work.

28.    FTC rules permit Plaintiff to charge and collect fees only after a debt resolution settlement is approved by a consumer's creditors and the consumer, and payments by the consumer under the settlement commence. Thus, there is a considerable time lag from when Plaintiff enrolls debt from a new consumer, until Plaintiff begins recognizing revenue from the enrolled debt.

Typically, Plaintiff works with a consumer client for approximately 49 months from enrollment before Plaintiff's fees are fully collected. Since Plaintiff's auditors and Generally Accepted Accounting Principles (GAAP) do not permit Plaintiff to recognize revenue from enrolled debt until FTC rules allow Plaintiff to charge fees to clients, Plaintiff did not experience a significant decline in revenue for the first, second, or third quarters of 2021. Forced remote work and lost employee productivity resulted in declines in Consumers enrolled in the program and therefore the enrolled debt balance declined in the first, second, and third quarters of 2021. The decline in enrolled debt in these quarters resulted in declines in revenue for periods after the first, second, and third quarters of 2021.

29. Throughout the 2019 calendar year, Plaintiff's average number of full-time employees (within the meaning of 26 U.S.C. § 4980H) was not more than 500. For the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, Plaintiff paid remuneration treated as wages under 26 U.S.C. § 3121(a) ("qualified wages") to its employees.

30. Plaintiff, via its payroll provider and reporting agent, timely filed Form 941, *Employer's Quarterly Federal Tax Return*, and timely paid all amounts due for each of the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021.

31. Plaintiff initially overreported applicable employment taxes on its Form 941 for each of the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, because Plaintiff did not claim the ERC for those employment tax quarters on its original Form 941 filings.

32. On or about January 29, 2024, Plaintiff filed with the Department of the Treasury, Internal Revenue Service, Cincinnati, OH 45999-0005, Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, for each of the employment tax quarters ending

March 31, 2021, June 30, 2021, and September 30, 2021. Copies of Plaintiff's Form 941-X filings are attached as Exhibit 1. A copy of the statement required by Rule 9.1(m) of the Rules of the Court of Federal Claims is attached as Exhibit 2.

33. Plaintiff reported qualified wages in the following amounts for the employment tax quarters listed below on Line 30 of its Form 941-X:

a. Qualified wages for the ERC of $5,721,595.95 for the employment tax quarter ending March 31, 2021;

b. Qualified wages for the ERC of $5,152,609.96 for the employment tax quarter ending June 30, 2021; and

c. Qualified wages for the ERC of $5,013,412.69 for the employment tax quarter ending September 30, 2021.

34. Plaintiff claimed refunds of the following amounts for the employment tax quarters listed below on Line 27 of its Forms 941-X:

a. $4,005,117.17 for the employment tax quarter ending March 31, 2021;

b. $3,606,826.97 for the employment tax quarter ending June 30, 2021; and

c. $3,509,388.88 for the employment tax quarter ending September 30, 2021.

35. Plaintiff correctly calculated its qualified wages and the amount of its ERC for each of the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, based on the wages Plaintiff paid to its employees.

36. More than six months have passed since Plaintiff filed its claims for refund on Forms 941-X. Defendant, United States of America, has not processed any of Plaintiff's claims for refund for the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021.

## CLAIM FOR RELIEF

## (Refund of Taxes)

37.    Plaintiff realleges and incorporates herein by reference all prior allegations.

38.    An employer is an "eligible employer" for the ERC for any calendar quarter in 2021 if (a) the employer was carrying on a trade or business, and (b) with respect to such calendar quarter, (i) the operation of the employer's trade or business was "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)" or (ii) the employer had a "significant decline in gross receipts." *See* Section 2301(c)(2) of the CARES Act, as amended by Section 207 of the Taxpayer Certainty and Disaster Relief Act of 2020, 26 U.S.C. § 3134(c)(2).

39.    Plaintiff is an eligible employer for the ERC for the calendar quarters ending March 31, 2021, June 30, 2021, and September 30, 2021. Plaintiff satisfies the first requirement for eligibility because Plaintiff was engaged in the trade or business of providing debt relief services during each of the calendar quarters ending March 31, 2021, June 30, 2021, and September 30, 2021.

40.    Plaintiff satisfies the first alternative test of the second requirement for eligibility because the operation of Plaintiff's trade or business was "fully or partially suspended" due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings due to COVID-19.

41.    Prior to the COVID-19 pandemic, Plaintiff used its office space for all operations, including call center operations, IT, training, and administration. The stay-at-home orders, business capacity restrictions, and masking mandates forced Plaintiff to transition all of its

employees to fully remote work. The forced transition to a fully remote workforce resulted in a significant decline in employee productivity in all areas. The primary driver of Plaintiff's business success is enrolling individual consumers and their debt in the Plaintiff's debt settlement program. During the first, second, and third calendar quarters of 2021, the overall dollar amount of consumer debt enrolled in the Plaintiff's debt settlement program declined significantly compared to the same calendar quarters in 2019 when Plaintiff's employees utilized its leased office space to conduct its business.

42.    An "eligible employer" is allowed the ERC against applicable employment taxes for each calendar quarter in an amount equal to 70 percent of the qualified wages paid with respect to each employee of such employer for such calendar quarters in 2021. *See* Section 2301(a) of the CARES Act, as amended by Section 207(b) of the Taxpayer Certainty and Disaster Relief Act of 2020; 26 U.S.C. § 3134(a).

43.    Plaintiff paid qualified wages for each of the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021. Qualified wages include "wages" within the meaning of 26 U.S.C. § 3121(a). *See* Sections 2301(c)(3), 2301(c)(5), and 2301(m) of the CARES Act, as amended by Sections 206(b) and 207 of the Taxpayer Certainty and Disaster Relief Act; 26 U.S.C. § 3134(c)(4), (n). During the 2019 calendar year, Plaintiff's average number of full-time employees (within the meaning of 26 U.S.C. § 4980H) was not more than 500. Thus, the qualified wages paid by Plaintiff for the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021, consist of all wages paid with respect to these calendar quarters. *See* Section 2301(c)(3) of the CARES Act, as amended by Section 207(e) of the Taxpayer Certainty and Disaster Relief Act; 26 U.S.C. § 3134(c)(4).

44.    The maximum qualified wages an eligible employer may take into account with respect to any employee for any calendar quarter in 2021 is $10,000. *See* Section 2301(b) of the CARES Act, as amended by Section 207 of the Taxpayer Certainty and Disaster Relief Act; 26 U.S.C. § 3134(b). This means that for each calendar quarter in 2021, an eligible employer may claim a credit of up to $7,000 for each employee.

45.    If the amount of the credit exceeds the employer's applicable employment taxes for the calendar quarter, the excess is treated as an overpayment that shall be refunded under 26 U.S.C. §§ 6402(a) and 6413(b). *See* Section 2301(b)(3) of the CARES Act, as amended by Section 207 of the Taxpayer Certainty and Disaster Relief Act; 26 U.S.C. § 3134(b)(3).

46.    Plaintiff previously paid all applicable employment taxes for the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021.

47.    Plaintiff is entitled to refunds of the following amounts based on the qualified wages paid by Plaintiff for the employment tax quarters ending March 31, 2021, June 30, 2021, and September 30, 2021:

a.    At least $4,005,117.17, plus interest thereon, for the employment tax quarter ending March 31, 2021;

b.    At least $3,606,826.97, plus interest thereon, for the employment tax quarter ending June 30, 2021; and

c.    At least $3,509,388.88, plus interest thereon, for the employment tax quarter ending September 30, 2021.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against Defendant, the United States of America, for:

i)  A refund of at least $4,005,117.17, or such greater amount as permitted by law, plus interest thereon, for Plaintiff's ERC claim for refund for the employment tax quarter ending March 31, 2021.

ii)  A refund of at least $3,606,826.97, or such greater amount as permitted by law, plus interest thereon, for Plaintiff's ERC claim for refund for the employment tax quarter ending June 30, 2021.

iii)  A refund of at least $3,509,388.88, or such greater amount as permitted by law, plus interest thereon, for Plaintiff's ERC claim for refund for the employment tax quarter ending September 30, 2021.

iv)  Reasonable litigation and administrative costs.

v)  Such other and further relief as the Court deems just and proper.

Dated: January 17, 2025          Respectfully submitted,

VENABLE LLP

/s/ Christopher N. Moran
Christopher N. Moran, Esq.
VENABLE LLP
750 East Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7604 (telephone)
(410) 244-7742 (facsimile)
cnmoran@venable.com

*Counsel for Plaintiff ClearOne Advantage, LLC*

Of counsel:

Theresa Clardy LaFazia
VENABLE LLP
2049 Century Park East
Los Angeles, CA
(310) 229-9609 (telephone)
(310) 821-8949 (facsimile)
tclardy@venable.com

-14-